NRC v. Huddleston 



IN THE COURT OF APPEALS, THIRD DISTRICT OF TEXAS,



AT AUSTIN




 





NO. 3-92-580-CV





NRC, INC. d/b/a NATIONAL REALTY,



 APPELLANT


vs.





RICHARD HUDDLESTON,



 APPELLEE



 




FROM THE DISTRICT COURT OF TRAVIS COUNTY, 98TH JUDICIAL DISTRICT



NO. 396,128, HONORABLE JOSEPH H. HART, JUDGE PRESIDING



 






 Appellee, Richard Huddleston, sued his escrow real estate agent, NRC, Inc. d/b/a
National Realty ("NRC"), for deceptive trade practices ("DTPA"), breach of warranty, and breach
of fiduciary duty in conjunction with a real estate transaction. A jury returned a verdict for
Huddleston for actual and punitive damages. The trial court rendered judgment for actual and
punitive damages based on NRC's breach of fiduciary duty, but denied actual damages and
attorney's fees for NRC's DTPA and warranty violations. NRC appeals from the trial court's
final judgment. Huddleston cross-assigns error for the trial court's failure to award additional
actual damages and attorney's fees.






THE CONTROVERSY


 Huddleston was a contractor who built homes for speculative resale in the Lago
Vista area. He completed and sold five or six such houses; the house made the basis of this
lawsuit was the last. He listed this house for sale at approximately $160,000.

 In early 1986, Bernie and Kathy McGinley expressed interest in the house in
question, but it was outside their price range. NRC, as the real estate agent, proposed a lease-purchase arrangement which Huddleston rejected. Finally, in February 1986, NRC presented
Huddleston with a real estate contract signed by the McGinleys for $130,000. After some
negotiations, Huddleston signed the contract on February 8, 1986. The McGinleys submitted a
$2,000 check to NRC as earnest money--more will be said later about the $2,000 check--and the
contract called for a closing date of March 7, 1986. The McGinleys could not obtain financing
and were unable to close on March 7, whereupon Huddleston gave the McGinleys an oral four-week extension to obtain financing. After the extension had expired and the McGinleys still had
not obtained financing, Huddleston began negotiations with E.E. and Lillian Dallmann for the
purchase of the property. The Dallmann contract was negotiated without a real estate agent; thus,
NRC was not entitled to a commission on the Dallmann contract. Additionally, the Dallmann
contract was for considerably more money, $153,000, than the McGinley contract of $130,000.

 Apparently, NRC and its agent-employee Carol Schneider learned about the
Dallmann contract and realized that NRC was going to lose a real estate commission. Carol
Schneider, in the presence of witnesses, threatened Huddleston that if he went through with the
Dallmann sale, she would see to it that Huddleston would never sell another piece of property in
Lago Vista. Furthermore, to carry out her threat, Schneider contacted the McGinleys and
encouraged them to file a suit for specific performance against Huddleston to force him to sell the
house at the $130,000 contract amount. On April 24, 1986, the McGinleys filed suit against
Huddleston for specific performance and in addition filed a lis pendens on the property effectively
blocking the sale of the property to the Dallmanns. Huddleston then filed a cross-action against
the McGinleys and joined NRC as a cross-defendant.

 In discovery before trial, Huddleston learned that NRC had never deposited the
$2,000 escrow check from the McGinleys. The check had been drawn on a closed bank account
and was thus "insufficient." There was considerable debate as to exactly when NRC knew the
check was bad. Huddleston presented a letter from NRC indicating that it knew the check was
bad at the time of the execution of the contract in February 1986. NRC called the author of the
letter at trial to explain that he did not know the check was bad until May 1986. (1) In any event,
it was undisputed in the trial testimony that NRC violated well-established rules set by the Real
Estate Commission in not depositing the escrow check and more importantly, in not informing its
principal, Huddleston, that the escrow check was "insufficient." Huddleston contended that the
latter breach by NRC was even more important because the McGinleys were apparently
experiencing difficulty in financing the purchase of the house.

 In the fall of 1986, the McGinleys, on the advice of counsel, decided to abandon
their specific performance lawsuit. At that point, the McGinleys offered to dismiss their case with
prejudice if Huddleston would drop his cross-action. Huddleston declined. As a result, the
McGinleys dismissed their case but without prejudice to refile. The importance here is that trial
testimony revealed that, even at this point, the Dallmanns were still willing to carry through on
the contract. However, Huddleston presented two attorneys as real estate experts who testified
that the McGinleys' dismissal without prejudice continued to cloud the title to the property and
that Huddleston was duty-bound to inform the Dallmanns, as he did, about this potential problem. 
NRC presented counter-experts who testified that a title policy could have been written on the
property and that the Dallmann sale could have been consummated, but even NRC's experts had
to admit that the title policy would probably have contained an exception not covering the
possibility of the refiling of the McGinley lawsuit. Ultimately, Huddleston lost the sale to the
Dallmanns and eventually lost the subject property to his lender through foreclosure.



The Jury Verdict

 After hearing all of the evidence and judging the credibility of the witnesses, the
jury failed to find the McGinleys engaged in any wrongful conduct. However, the jury found
liability on the part of NRC, and awarded Huddleston actual and punitive damages. Specifically,
the jury findings are outlined as follows:



A. Liability


 1. DTPA Violations


 (a) Misrepresentation


 Question 1 - NRC engaged in false, misleading or deceptive acts
or practices.


 (b) Breach of Warranty


 Question 3 - NRC failed to perform services in "a good and
workmanlike manner."


 Question 4 - NRC breached an express warranty.


 2. Breach of Fiduciary Duty


 Question 8 - NRC breached fiduciary duties it owed to
Huddleston.


B. Actual Damages


 Question 5 - Actual Damages for DTPA violations: $13,958.


 Question 9 - Actual damages for breaching its fiduciary duty:

 $23,042.


C. Exemplary Damages


 Question 10- Awarded $50,000 for NRC's breach of its fiduciary
duty to Huddleston.



The Trial Court's Judgment

 NRC moved for judgment notwithstanding the verdict, while Huddleston moved
for judgment on the verdict. The trial court rendered judgment for Huddleston against NRC for
actual damages of $23,042, and exemplary damages of $50,000 for its breach of fiduciary duty. 
The trial court disregarded the jury's DTPA findings and, as a result, did not award the actual
damages of $13,958 for the DTPA violations and refused to award $41,917.50 in attorney's fees
proved by Huddleston as reasonable and necessary.

 NRC appeals, bringing forth four points of error. NRC challenges the jury's
liability findings in points of error one and two and the damages award in points of error three
and four. By a cross-point of error, Huddleston contends that the trial court erred in refusing to
award damages for the DTPA and warranty violations NRC committed.


DISCUSSION


The Jury's Liability Findings

 In its first point of error, NRC contends that the evidence is legally and factually
insufficient to support the jury's findings on causal connection, i.e., that NRC's DTPA and
warranty violations were a producing cause of Huddleston's damage. We note at the outset that
NRC does not challenge that portion of the jury's liability finding regarding wrongful conduct,
but only whether such conduct was a cause in fact of Huddleston's damages. Indeed, NRC
candidly admits that it engaged in at least one wrongful act in failing to deposit the McGinleys'
escrow deposit check at the time of the initial real estate contract between Huddleston and the
McGinleys. Such conduct is admittedly a violation of the rules and regulations of the Real Estate
Commission and subjected NRC to a fine and reprimand by that body.

 In deciding a no-evidence point, we must consider only the evidence and inferences
tending to support the finding of the trier of fact and disregard all evidence and inferences to the
contrary. Alm v. Aluminum Co. of Am., 717 S.W.2d 588, 593 (Tex. 1986), cert. denied, 111 S.
Ct. 135 (1990); Garza v. Alviar, 395 S.W.2d 821, 823 (Tex. 1965). In deciding a factual-sufficiency point, we must consider and weigh all the evidence, and may set aside the judgment
only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and
unjust. Cain v. Bain, 709 S.W.2d 175, 176 (Tex. 1986); In re King's Estate, 244 S.W.2d 660,
661 (Tex. 1951); see also Pool v. Ford Motor Co., 715 S.W.2d 629 (Tex. 1986); see generally
William Powers, Jr. & Jack Ratliff, Another Look at "No Evidence" and "Insufficient Evidence",
69 Tex. L. Rev. 515 (1991). 

 The gist of NRC's argument is that Huddleston's case is premised on the failure
of the Dallmann contract. NRC argues that since the Dallmanns were still ready to perform under
the contract even after the McGinleys dismissed their lawsuit against Huddleston and released
their lis pendens on the subject property, no action of NRC could have been responsible for the
ultimate failure of the sale to the Dallmanns. We reject this argument.

 The burden at trial was on Huddleston to prove producing cause, which the court's
charge defined as follows:



"Producing cause" is an efficient, exciting or contributing cause, which in natural
sequence produces the injuries or damages complained of, if any. There can be
more than one producing cause.


It is incumbent on Huddleston only to prove that NRC's conduct was a producing cause, as
opposed to the sole cause. Rourke v. Garza, 530 S.W.2d 794, 801 (Tex. 1975). Uncontroverted
testimony from Huddleston established that had he known that the McGinley escrow check was
drawn on insufficient funds, he would never have extended the original real estate closing and the
McGinley contract would have expired long before the origination of the Dallmann contract. 
Further, had the insufficiency of the escrow check's funds been known at the time of the
McGinley contract's expiration, the McGinleys' breach would have undermined any possible
lawsuit by the McGinleys against Huddleston for specific performance. Thus, Huddleston
maintains that, with the elimination of the McGinleys' lawsuit and their lis pendens filing, the sale
to the Dallmanns easily would have been consummated.

 NRC also overstates its argument that the Dallmanns were willing to perform even
after the McGinley lawsuit was dismissed. Mr. Dallmann stated that absent any title problems
his wife still wanted to buy the property. There was considerable controversy at trial about this
issue. Huddleston felt it was his duty to inform the Dallmanns about the McGinley lawsuit and
the lis pendens. Although the McGinleys ultimately dismissed the lawsuit, they refused to dismiss
the cause with prejudice. Thus, at the time that the Dallmanns were considering purchasing the
property, Huddleston felt compelled to divulge to the Dallmanns that the McGinleys could refile
their lawsuit during the four-year statute of limitations period. There was considerable expert
testimony on both sides about the reasonableness of Huddleston's actions and the state of the title
to the subject property at this point. Huddleston's attorney/real estate experts insisted that
Huddleston's conduct, under these circumstances, was reasonable and that the Dallmanns were
faced with the possibility of further litigation on the property. NRC's experts had to admit that
litigation was always a possibility, but insisted the possibility was remote. Based upon this
evidence, the jury resolved the issue in Huddleston's favor. While we agree that the evidence
conflicts, we conclude that there is ample evidence to support the jury's conclusions that NRC's
wrongful conduct was a producing cause of Huddleston's damages. NRC's first point of error
is overruled.

 In its second point of error, NRC contends that the evidence is legally and factually
insufficient to establish that NRC's breach of its fiduciary duty to Huddleston was a proximate
cause of damages to Huddleston. NRC argues that the McGinleys' lawsuit and lis pendens filing
were absolutely privileged and therefore NRC's conduct in encouraging the McGinleys to file suit
was also privileged. We disagree.

 This Court has observed that a fiduciary owes to its principal a strict duty of "good
faith and candor," as well as "full disclosure respecting matters affecting the principal's interests,"
and that there is a "general prohibition against the fiduciary's using the relationship to benefit his
personal interest." Chien v. Chen, 759 S.W.2d 484, 495 (Tex. App.--Austin 1988, no writ). (2) A
case very factually similar to the instant cause is Capital Title Co., Inc. v. Donaldson, 739
S.W.2d 384 (Tex. App.--Houston [1st Dist.] 1987, no writ). In Donaldson, Capital Title, as
escrow agent for the seller, Donaldson, misrepresented the date of the receipt of the escrow check
from buyer one. As a result, Donaldson lost his sale to buyer two and consequently brought suit
against Capital Title. The Houston First Court of Appeals upheld the jury's findings against
Capital Title for fraud, misrepresentation, and breach of fiduciary duty. On the latter cause of
action, the court specifically held that Capital Title had breached its fiduciary duty to Donaldson
by engaging in conduct that benefitted itself, to the detriment of its principal Donaldson, and
deprived him of a more profitable sale. Id. at 390.

 Here, NRC's course of conduct by its employee, Carol Schneider, was designed
to accomplish the same result. NRC realized that without the sale to the McGinleys, it would be
deprived of a real estate commission. Therefore, Schneider's actions were directed toward forcing
Huddleston to carry through on the McGinley contract, with the end result being the loss to
Huddleston of the Dallmann contract, which was more profitable. We hold that the jury could
decide that this conduct was a direct and proximate cause of damage to Huddleston, and overrule
NRC's second point of error.



The Jury's Damage Findings

 In its third point of error, NRC contends that there is insufficient evidence in the
record to allow the jury to calculate the lost profits from the Dallmann sale and, thus, the jury's
damage award is not supported by sufficient evidence.

 The jury awarded Huddleston $37,000 in actual damages at trial. The two
questions submitted in the court's charge were Questions 5 and 9. In response to Question 5, the
jury awarded $13,958 for NRC's DTPA violations. (3) In response to Question 9, the jury found
$23,042 in damages for NRC's breach of fiduciary duty. (4)

 The evidence at trial established the following. Huddleston contended that he had
lost $37,000 because of NRC's actions in blocking the sale to the Dallmanns by encouraging the
McGinleys to sue for specific performance and file a lis pendens on the property. Huddleston
calculated his damages, as evidenced by plaintiff's Exhibit 8, in the following manner:


 $ 153,000 Sales Price


 116,000 Note Payoff


 37,000


In addition, Huddleston testified to certain other costs, which he called carrying costs, including
items such as interest, utilities, maintenance, ad valorem taxes, and insurance. On this particular
piece of property, the carrying costs were $1327 per month. Huddleston testified that one of the
reasons he was willing to consider the McGinley contract at $130,000 was because that amount
would pay off his bank loan of $116,000 and would stop accumulation of additional carrying
costs.

 NRC's basic attack was to establish on cross-examination that Huddleston had more
cost tied up in the project than his $116,000 bank note. The defense brought out on cross-examination that Huddleston had paid $23,042 cash for the lot. Thus, it was NRC's position that
only between $10,000 and $13,000 of the Dallmann sale at $153,000 would constitute profit. On
redirect, Huddleston contended that at the Dallmann closing he would pocket $37,000 in cash free
and clear of all his loan obligations, which he considered profit in light of the ultimate alternative,
the subsequent foreclosure in which he lost the house and lot and received no reimbursement.

 On appeal, NRC continues its same attack on the jury verdict as it used in the trial
court, and additionally contends that the record lacks any evidence as to the original cost of
constructing the house. Our review of the record reveals that the original bank note was for
$106,000. (5) It is certainly inferable that the original note amount constitutes the original
construction cost. We also believe that there is a certain ambiguity in the trial court's instruction
on lost profit. The court's instruction defines lost profit as the "difference between the amount
Huddleston would have received under the Dallmann contract and the cost of the property to
Richard Huddleston." The jury apparently agreed with Huddleston that $37,000 cash in his
pocket was profit to him. However, even assuming the interpretation of the charge utilized by
NRC is the correct one, we conclude that there is ample evidence to support the verdict and
judgment.

 From the testimony of Huddleston, the jury could properly conclude that the cost
of the land, $23,042, and the original cost of construction, $106,000, gave Huddleston a total cost
basis in the property of $129,042. Huddleston's contract with the Dallmanns for $153,000 minus
$129,042, the cost to him for the property, even under NRC's analysis, yields a profit of $23,058. 
Since the actual damages awarded in the judgment totals $23,042, this profit yield is sufficient to
support the judgment.

 However, in view of our conclusion regarding Huddleston's cross-point, we will
consider the total actual damages of $37,000. We conclude that the evidence is sufficient to
support the entire verdict on actual damages of $37,000 because NRC has completely overlooked
a second actual damage element in the court's charge: out-of-pocket expenses. Here, the
testimony established that, as a result of NRC's conduct and the subsequent McGinley lawsuit,
Huddleston was delayed in closing on the Dallmann contract for a number of months. (6) 
Huddleston was incurring carrying costs on the property at the rate of $1327 per month. As a
direct result of NRC's wrongful conduct, a delay in closing on the Dallmann contract of a mere
twenty-eight months would support the jury's actual damage award of $37,000.

 Based upon this record, we conclude that there is sufficient evidence to support the
jury's award of actual damages. NRC's third point of error is overruled.

 In its fourth point of error, NRC argues that since there is insufficient evidence to
support Huddleston's actual damages, the jury's punitive damage award must fail. In view of our
holding that the evidence supports the jury's award of actual damages, we conclude that there is
ample basis for upholding the punitive damage award as well. NRC's fourth point of error is
overruled.

HUDDLESTON'S CROSS-POINT


 In his sole cross-point, Huddleston contends that the trial court erred in not
awarding him actual damages for NRC's violations of the DTPA. Additionally, Huddleston
argues that the trial court should have awarded him attorney's fees pursuant to the DTPA. NRC
responds that the trial court rendered the correct judgment because Huddleston is not permitted
to make a double recovery of actual damages that result from the same tortious conduct. NRC
alleges that both the breach of fiduciary duty and the DTPA violations arose out of the same
alleged wrongful conduct:



(1) NRC misrepresented that they had deposited the McGinley earnest money
check;


(2) NRC failed to deposit the McGinley check within a reasonable time;


(3) NRC failed to disclose before the McGinley contract was signed or before
the extension granted that the bank account was closed;


(4) NRC's employee encouraged the McGinleys to file a lawsuit against
Huddleston; and


(5) NRC's employee threatened to keep Huddleston from buying or selling any
property at Lago Vista.



Therefore, NRC contends that the trial court correctly required Huddleston to elect between the
actual damages awarded under the DTPA and the damages awarded for the breach of fiduciary
duty.

 It is well-established law that a plaintiff may not recover twice under alternative
causes of action. Southern County Mut. Ins. Co. v. First Bank & Trust of Groves, 750 S.W.2d
170, 173-74 (Tex. 1988); Birchfield v. Texarkana Memorial Hosp., 747 S.W.2d 361, 367 (Tex.
1987); Stevenson v. Koutzarov, 795 S.W.2d 313, 322 (Tex. App.--Houston [1st Dist.] 1990, writ
denied). However, the remedies provided for in the DTPA are cumulative of other legal
remedies:



 The provisions of this subchapter are not exclusive. The remedies provided in
this subchapter are in addition to any other procedures or remedies provided for
in any other law; provided, however, that no recovery shall be permitted under
both this subchapter and another law of both actual damages and penalties for the
same act or practice.


Tex. Bus. & Com. Code Ann. § 17.43 (West 1987) (emphasis added). The crucial issue for
decision then is whether the jury's damage awards were for the same act or practice.

 In conjunction with the jury's finding that NRC had violated the DTPA by engaging
in false, misleading, or deceptive acts, the jury was specifically instructed by the trial court "that
the filing of a specific performance lawsuit or filing of a lis pendens does not constitute a false,
misleading, or deceptive act or practice." The jury's damages issue in Question 5 was conditioned
on an affirmative response to the DTPA liability findings.

 On the other hand, we have held that the evidence supports a breach of NRC's
fiduciary duty to Huddleston by its conduct in encouraging the McGinleys to file a specific
performance lawsuit and lis pendens against the property. The jury's response to Question 9
regarding damages is conditioned on an affirmative liability finding that NRC breached its
fiduciary duty.

 Therefore, we hold that the trial court erred in forcing Huddleston to elect between
the two actual damage findings because the jury's verdict is premised on different conduct and
therefore, does not constitute a double recovery. We sustain Huddleston's cross-point.



CONCLUSION


 We affirm that portion of the district court's judgment awarding actual and punitive
damages for NRC's breach of its fiduciary duty to Huddleston. We reverse that portion of the
district court's judgment denying Huddleston DTPA damages as found by the jury and render
judgment awarding Huddleston damages of $13,958 for NRC's violation of the DTPA. Because
the amount of attorney's fees under the DTPA is a question of fact, (7) we remand that portion of
the cause to the trial court for determination of the award of attorney's fees.



 

 Mack Kidd, Justice


Before Justices Powers, Jones and Kidd

Affirmed in Part; Reversed and Rendered in Part; and Reversed and Remanded in Part

Filed: October 26, 1994

Publish 
1.   This dispute in the evidence was, of course, for the jury to resolve.
2.   The trial court instructed the jury on fiduciary duty:


 You are instructed in connection with your answer to Jury
Question No. 8 [breach of fiduciary duty] that real estate agencies are
fiduciaries toward sellers of real estate. And, that NRC, Inc., as a
fiduciary, was required to exercise fidelity and good faith toward its
principal; a fiduciary cannot put itself in a position antagonistic to its
principal's interest. A fiduciary has a positive duty to communicate all
information which he has available to him or should have available to him
which might be useful to its principal in making a business decision. The
fiduciary duties which a real estate agent must provide include reasonable
care, loyalty, and accounting.
3.   Question 5 submitted the damages for the DTPA violations as follows:


 What sum of money, if any, if paid now in cash would fairly and reasonably
compensate Huddleston for his damages, if any, that resulted from the conduct of
NRC, Inc. d/b/a National Realty you found that was committed in response to Jury
Question Nos. 1, 2, 3, or 4?


 You are instructed in connection with your answer to Jury Question No. 5 that you
may consider the following elements of damages and no others:


 a) Lost profit of the Dallmann sale;


 b) Out of pocket expenses incurred with respect to the property after
the Dallmann contract should have closed.


 You are instructed that "lost profit of the Dallmann sale" means the difference
between the amount Huddleston would have received under the Dallmann contract
and the cost of the property to Richard Huddleston.


 You are further instructed to subtract from your answer any amount that you find
Huddleston could have saved by the exercise of reasonable care. You may not
subtract an amount that may have been avoided by Huddleston's agreement to settle
his claims against the McGinleys.


 ANSWER in dollars and cents, if any.


 Answer: $ 13,958 .
4.   Question 9 submitted the damages for fiduciary duty violations as follows:


 What sum of money, if any, if paid now in cash would fairly and reasonably
compensate Huddleston for his damages, if any, that resulted from the conduct of
NRC, Inc. d/b/a National Realty you found that was committed in response to Jury
Question No. 8?


 You are instructed in connection with your answer to Jury Question No. 9 that you
may consider the following elements of damages and no others:


 a) Lost profit of the Dallmann sale;


 b) Out of pocket expenses incurred with respect to the property after
the Dallmann contract should have closed.


 You are instructed that "lost profit of the Dallmann sale" means the difference
between the amount Huddleston would have received under the Dallmann contract
and the cost of the property to Richard Huddleston.


 You are further instructed to subtract from your answer any amount that you find
Huddleston could have saved by the exercise of reasonable care. You may not
subtract an amount that may have been avoided by Huddleston's agreement to settle
his claims against the McGinleys.


 ANSWER in dollars and cents, if any.


 Answer: $ 23,042 .
5.   Apparently by trial the interest had increased the balance owed on the note to $116,000,
which was Huddleston's starting point for his profit projection.
6.   Although the length of the delay is not clearly revealed by the record, the Dallmann contract
was dated April 17, 1986, and this cause was tried six years later, in June of 1992.
7.   In this case the parties stipulated that the amount of attorney's fees would be submitted to
the trial court rather than the jury for determination.